Good morning, Your Honors, and may it please the Court. Diana Kim on behalf of the California Attorney General. If I may, I'd like to reserve five minutes for rebuttal, please. The Supreme Court in National Pork emphasized that the Dormant Commerce Clause's core is anti-discrimination and that courts should exercise extreme caution before striking down state laws. Here, it's undisputed that AB 824 is not discriminatory and does not violate pipe balancing. What AAM wants instead is a third avenue for striking down non-discriminatory state laws based solely on extraterritoriality. This Court has two independent paths for rejecting that claim. First, there is no such claim at all because the reasoning of National Pork abrogated any basis for a freestanding extraterritoriality doctrine under the Dormant Commerce Clause. Alternatively, the Court could save that abrogation question for a later date, like it did in Flint, and uphold AB 824 even under pre-National Pork decisions. As AAM concedes, those decisions at least allow states to regulate activity that is partly out-of-state and partly in-state, and AB 824 satisfies that requirement because it reaches only agreements that have a connection to sales in California. So, Ms. Kim, you know that if we were to find that our prior cases, Sam Francis and Sharp Smart, were irreconcilable with National Pork producers, we would have to have a really clear indication that they're clearly irreconcilable. But I read footnote 1 of National Pork producers to still allow for the viability of a direct theory of regulation, direct regulation that is outside of the state boundaries. On what grounds do you think that National Pork producers abrogated our prior cases? Sure, Your Honor. So, if I may, I'd like to make two points about footnote 1. First, that I think AAM is misreading and over reading that footnote. And second, that even under that reading, it wouldn't affect this court's abrogation standard for prior circuit precedent. So, on the first point, the Supreme Court in footnote 1 was not endorsing the Edgar plurality opinion or even affirmatively citing it. The court was rejecting the plaintiff's attempt to rely on that opinion, which was a fractured 1982 decision in which only a plurality reached the extraterritoriality. I understand that, but it also didn't reject out of hand the notion that there could be a viable dormant commerce clause claim based on direct regulation to activity outside the state. And so, if you have that signal, then aren't we bound by our prior case law that is based on that direct regulation theory? No, Your Honor. So, this court's standard for abrogating prior circuit precedent doesn't look at whether the Supreme Court specifically addressed the issue before this circuit or looked at facts that are identical. Even if it carved out that question, the question is whether the reasoning of the court's holding is irreconcilable. And the reasoning of the Supreme Court's holding there was that Healey and Baldwin do not stand for the principle that this court thought it did in Sam Francis and Daniel Sharpsmart. Those decisions read Healey-Baldwin to stand for an extraterritoriality principle that the Supreme Court clarified is about anti-discrimination. If you take that reading of Healey-Baldwin out of the Sam Francis and Daniel Sharpsmart's decisions, there's nothing left in those opinions that supports the extraterritoriality doctrine. And in particular, I point out that in our opening brief at page 37, we did cite a number of cases that are examples of how this court has applied the abrogation standard in cases where the holdings of the Supreme Court's opinion didn't directly speak to the question that was before the circuit, and yet this court still recognized that it was abrogated based on different reasoning. In particular, I think two of those cases are especially relevant to your question about footnote one, Head v. Wilkie and SEIU Local v. Los Robles Medical Center were cases in which the Supreme Court actually specifically carved out the question that was before the circuit, like you're reading footnote one to do. And in those cases, this court still recognized that the reasoning of the holding abrogated prior circumstances. I mean, I think your friends on the other side would say, yes, National Pork Producers focused on discriminatory and economic protectionism, but it was the district court found you're tossing out a per se standard, not that it couldn't happen through other means, or that it might be more difficult to achieve or prove that up, but whether National Pork Producers actually said we are only going to allow dormant commerce clause claims based on economic I believe the per se standard that the court was throwing out there was per se in the sense that they were trying to create another avenue to invalidate state laws besides the discrimination and pike balancing avenues. So it was per se in the sense that they wanted the extraterritorial effects on their own to strike down the law without requiring the court to analyze whether it was discriminatory or violated pike balancing. AAM's rule is per se in the same way. They want to rely on solely the extraterritoriality feature without looking to whether the law is discriminatory or violates pike balancing. So you are going to pivot to your second argument, which is that there's that it regulates activity both in state and out of state. Can you explain why? Because the plain text of the statute doesn't seem to have any geographic limitations. Sure, your honor. So it is true that that particular sales clause doesn't say the words in California. But when the statute doesn't directly address this, the question before the court, the court looks to other tools of statutory interpretation. And here all of those other tools point to an in state sales requirement. Before I get to those other tools, though, I would point out that AAM hasn't meaningfully disputed our interpretation in their briefs before this court and so has forfeited any contrary interpretation. But if you were to look at the principles of statutory interpretation, courts assume that the California legislature legislates with domestic concerns in mind, and then it interprets the statute consistent with those purposes. And here the purpose of the legislature was to protect California consumers and a reading of the statute that includes this in state sales element ensures that it's only reaching agreements that affect California consumers. The California Supreme Court and does the word sales even come up in 88 to four? It does, your honor. It is. It's in the text of the statute in the provision. You'll give me one moment. Um, it says an agreement. So except as provided in paragraph three, an agreement resolving or settling on a final interim basis, a patent infringement claim, comma, in connection with the sale of a pharmaceutical product. And that's the phrase that we're reading to mean in the sale of a part. It doesn't say, excuse me, you're talking really fast, but it doesn't say sale of a pharmaceutical product in California. So can it not be fairly interpreted as it could be a sale anywhere? No, your honor. We think that the the the principles of statutory interpretation under California law would require a reading that requires a connection to California. And I would direct your honor, for example, to warden Oman, which are both cases of the California Supreme Court in which the court read a connection to the state of California into a statute that had no mention of geographic limitations whatsoever. I would direct your honor to warden Oman because there are other statutory clues in AB 824 that reinforce the reading. So the statute defines an agreement by incorporating the Cartwright Act's definition of trust, and that in the Cartwright Act, and that incorporates or sort of imports the old soil with it. So we know that the Cartwright Act reaches out of state conduct only to the extent that it affects in-state injuries. And it makes sense to read AB 824 in the same way. I'd also point out that in the penalty provision, the value of the the value that's attributable to the violation is defined as California's share of the market, which again presumes that there are California sales. So these just reinforce the the ordinary principles that California courts read California laws to have a connection to the state of California. I mean, because of California's size, as a practical matter, even if we were to interpret AB 824 to only involve California sales, doesn't that virtually reach all settlement agreements anyway? As a practical matter, it is true that California is the largest pharmaceutical drug market in the country, but as a constitutional matter, then the limitation is significant because it does ensure that every agreement that's reached under this law has a connection to to the state of California. If that means that that's most or almost all laws, that's just a feature, a practical feature of the size of California, but not a constitutional problem. If it were otherwise, it would mean that it is a constitutional problem if you consider the Dormant Commerce Clause to not want to create state actions that substantially affect regular activities outside the state, you know, as if California were the federal government, right? So no, Your Honor, but for two reasons. One, parties that don't want to comply with California's law have options. They can choose to withdraw from California's market, or they can choose to segregate their settlement agreements in a way that separates California from other markets where they... All the other 49 states. California is the only one, the only state that has this law, right? As far as I'm aware, yes. And so how would this be leased? You know, California regulators would look and see an agreement and they would start to decide whether that agreement implicates California based on sales, and how many sales would that require to trigger California regulator scrutiny? Courts would look to whether or not the pharmaceutical drug is sold in California, and we haven't had an opportunity... That's it, just even one dollar's worth of brand-name drugs in the settlement ostensibly might affect that without an entrant, and so therefore California gets to regulate that? So as a practical matter, we think that question is very unlikely to arise because California, as AAM represented below, California is the largest pharmaceutical drug market in the country. So if there are sales in California, it's very unlikely that there's going to be only one dollar of sales, but if there were such a hypothetical situation with one dollar of sales, the proper avenue for challenging that kind, if you thought that that was not a sufficient connection, the proper avenue for challenging that would be to bring in a narrow as-applied challenge to that particular agreement or that particular drug. Part of the issue is that it begs the question, and on the one hand you're arguing that we should infer that the legislature only intended to have California effects, but if we step back and as a practical matter, this might regulate all manner of settlement agreements outside of California. Maybe that was the legislature's intent, to actually regulate all kinds of settlement agreements that California might deem problematic. No, your honor, the legislative history makes clear that the legislature was concerned with protecting California consumers, and by reaching only agreements for which there is a connection to sales of the pharmaceutical drug in California, that ensures that there is an effect in the state of California. The evidence before the legislature showed that generics are almost always cheaper than brand drugs, and so their entry into the market almost always brings down the pharmaceutical drugs price. So any agreement that prolongs the monopoly will keep the brand drug in California at a higher monopolistic price than the competition would have been if the generic had entered in California. Were you gonna speak to the preemption issue at all? Yes, your honor, I want to make sure. Yeah, I wanted to ask you about your friend on the other side's argument that this interferes with the patent holder's right to grant exclusive licenses to others. Why do you think that doesn't create a direct conflict with patent law? Your honor, that argument misunderstands the right to grant exclusive licenses, and then the right to the ability to use those exclusive licenses for any ends, even unlawful ends. So the Patent Act grants a right to grant exclusive licenses, yes, but it doesn't immunize those exclusive licenses from scrutiny under other laws if those licenses are used to illegal ends. For example, I don't think anyone would think that the patent law prevents states from applying their bribery laws to the use of an exclusive license to bribe a public official, because in that case it's not the fact that it's an exclusive license that matters, it's the end to which the exclusive license is being used. And that's true in ABA 24 as well. The point is that the exclusive license is being used to pay for delay, and it's the pay for the delay that is unlawful. The exclusive license is merely the form of compensation in which the illegal end is being achieved. But it isn't unlawful under federal law. Whether or not it was an unintended consequence to me seems irrelevant, because the law did not make this kind of adverse settlement illegal. This is California stepping up and acting in a way that's contrary to the federal scheme in allowing this to happen. No, Your Honor. The Hatch-Waxman Act doesn't endorse these kinds of agreements. The Supreme Court in Actavis made very clear that the Hatch-Waxman Act's purposes do not include endorsing or allowing these kinds of agreements. The court pointed to express statements from the legislature condemning these kinds of agreements. Right, and you bring up Actavis. Didn't Actavis actually say you had to look at these deals on a case-by-case basis to determine their anti-competitive effect? Actavis said that as a matter of federal antitrust law. It didn't say that state And that's because Actavis wasn't a preemption case. It was explaining how to apply federal antitrust law, because the only claim before the court in that case was a federal antitrust law claim. So what the court held is that patent law doesn't immunize these kinds of agreements from antitrust scrutiny. And then it went on to explain how to apply that antitrust scrutiny under federal law, but it never said that patent law only permits antitrust scrutiny if that scrutiny takes the particular form of the rule of reason analysis that the court adopted for federal law. In fact, there is one court that has addressed that preemption question, and that's the California Supreme Court in Cipro. But the California law creates a presumption of illegality, which the federal law does not. Yes, Your Honor, that's true. We haven't argued that the laws are identical. Our primary argument is that they don't have to be, because Actavis said that there is no presumption as a matter as a matter of federal antitrust law. It didn't say that it had to adopt that rule in order to avoid a conflict with patent law. The court's analysis about patent law didn't depend on the ultimate rule of reason analysis that was later adopted. In fact, the court gave five reasons for saying why patent law permits antitrust scrutiny in these areas, and none of those five reasons are unique to the rule of reason. All five of them would support application of AB 824 as well. If I might just quickly walk through each of those five, I think it'll illustrate why AB 824 doesn't conflict with anything that the Supreme Court said about patent law. I do see that I'm running into my rebuttal time, so I'll be very quick about it. First, the Supreme Court said that reverse payments create an inference or are strong indication of anti-competitive desire to delay generic entry. That's true of AB 824, as well as the rule of reason. Second, the court said that defendants will still have an opportunity to show legitimate justifications. AB 824 allows them that as well. Third, the court said that reverse payments are a strong indicator of market power. That supports AB 824, as well as the rule of reason. Fourth, the court said that you don't need to be concerned about administrability because you don't have to determine patent validity as part of the antitrust scrutiny process. That's true of AB 824, as well. And in fact, AB 824 is more administrable because it provides greater structure to the analysis. And fifth, the court said that parties can still continue to settle as long as they don't pay for delay. And that's what AB 824 does as well. It allows all manner of settlements, as long as the parties aren't paying for delay. I see that I've run into my rebuttal time, so unless the court has any other questions, I'll reserve the rest of my time. Thank you. Thank you. Good morning, Your Honors. May it please the court, William J. for AAM. When we get to the cross-appeal, I'm going to try to reserve two minutes for rebuttal. On the appeal, I want to begin with this court's precedent because I think it's instructive how the pork producers case got to the Supreme Court. The Supreme Court affirmed this court's decision in pork producers. That decision had said that the direct regulation line of cases was not implicated by Proposition 12 precisely because Proposition 12 did not regulate out-of-state conduct. It regulated in-state conduct the sale of pork meat or non-compliant meat in the in the state of California. It is not clear to us how the Supreme Court, by affirming this court's decision, could have overturned this court's precedent. Nothing in the Supreme Court's reasoning disapproved the Daniel Sharpsmart-Sam Francis line of cases. Well, I mean, there is a little bit of a muddle here because it does, the court does seem to call into question the notion of an extraterritoriality theory, you know, which is not tethered to discrimination or economic protectionism where a state regulates something and it has these external effects on others. But as I see it, there are two different types of cases like that. One of them is a national pork producers one where you regulate in-state and that has out-of-state effects. And then another one might be direct regulation, you know, outside the state's boundaries. But they both seem to fall under a rubric of extraterritorial extraterritoriality which the court seemed to call into question. Do you agree with that framing of it or do you see it a different way? So I agree that there are two different types of cases and that what Your Honor described is correct. It is how this court has always seen them, that there is a difference between regulating conduct that occurs out-of-state versus regulating conduct in-state and that regulation has the practical effect, as the words the Supreme Court used, of causing people to change their behavior out-of-state. It is the latter that Proposition 12 implicated and that is what the Supreme Court and pork producers said is not implicated by the Dormant Commerce Clause. That there was no extraterritoriality doctrine so robust as to prevent states from adopting regulations of in-state conduct based on their upstream practical out-of-state changes in other people's behavior. That I think is the import of the paragraph in pork producers that, you know, sort of the Parade of Horribles, Floodgates paragraph that discusses just how many state laws would be invalidated if the pork producers theory were accepted. But that is exactly what our theory in this case, the auction houses theory in Sam Francis and the disposing company in Daniel Sharpsmart do not do. Each of those statutes involved an actual regulation of conduct that occurs out of state that may well be lawful where it is entered into and it is the out-of- state transaction that is the focus of the penalty. Let me ask you this, the footnote one in National Pork Producers in describing Edgar talked about direct regulation out of state but also by those who have no connection to the state. So it adds this, it's this add-on of not just direct, you know, regulation out of state but for something where there's no connection to the state. And if California's theory is that these reverse settlement agreements substantially increase the cost of prescription drugs in California, how can there be no connection to the state when when there's such a big impact on on the footnote one as saying no connection whatsoever in the in the entire set of facts? It refers to the transaction that was being entered into in Edgar and I think that's just how this court has read it in cases like Sam Francis. Let me explain what I mean by that. So in Sam Francis everyone regulated by the unconstitutional parts of the statute was a Californian. A Californian traveling outside of the state to enter into one of these art sales and didn't matter whether you came back to California with the money from the art sale in your pocket. The point was that the sale being regulated was a sale outside of California. In Edgar as well, these were Illinois corporations that were also headquartered in Illinois but the relevant stock sale occurred between a willing buyer and a willing and a willing seller outside of Illinois, not resident in Illinois. There certainly was a connection between them and the Illinois company whose stock they were buying and the laws of Illinois in that sense. I think that the California residency of the sellers of art in Sam Francis is if anything more robust than California can point to here and this court held en banc that that was not a sufficient connection because it wasn't what was being regulated. What was being regulated is the out-of-state sale which as I mentioned may well be entirely lawful in the state where it occurs. That is why this part of the extraterritoriality doctrine is so important. So you would not see 824 saved if we were to construe it to apply only to California sales or settlements that implicate sales in California? That's exactly what I was going to say, Your Honor, because it is not the sale that is regulated. It is the settlement that is regulated. It is the settlement that is penalized. It is the people who are involved in the settlement who are penalized. All they can say is that the statute in connection with the sale of a pharmaceutical product should be read to say in connection with the sale of a pharmaceutical product in California and you heard my opposing counsel acknowledge that one dollar is enough for purposes of their view to trigger the statutory coverage. I think that Judge Wardlaw's question recognizes correctly that the legislature may well have been attempting to regulate broadly precisely because of dissatisfaction with the regime that the Supreme Court laid down in activist. The legislature seems pretty clearly to have concluded that that is not a stringent enough regime and it wants to outlaw settlements that don't fit California's view of what the antitrust laws should prohibit. That's why it targets the settlement and not the sale in California. There's no regulation of price in the statute. There is no requirement that any particular price be charged in California or anywhere else. It's the settlement that incurs the penalty and that I think is what makes it directly analogous to what the... But their theory is that the settlement affects the price and it should affect only prices in California. They certainly don't think that it affects only prices in California, Your Honor. I think they acknowledge that if to the extent they are relying on some effect in California to justify their theory, it's not something that is specifically regulated by the statute, nor is it different from the price effect that they're claiming occurs everywhere in the country. What do you say to the argument that we should interpret this by implication as applying only to sales in California? The reason that wouldn't save the statute, as we said in our brief, not only that it is not an available construction given the words the legislature used, but also that it would not be material because the thing that is penalized is still the settlement. It is not the sale in California and so changing the wording to say in connection with the sale of a pharmaceutical product in California wouldn't change the fact that as the court recently explained in the Flint case, what is targeted is the settlement. It is not the sale in California. That's why we think that the idea of a saving construction is kind of a red herring here. I'm happy to address why the California Supreme Court's decisions in the pay stub cases involving airline pilots and flight attendants don't don't really bear on that, if that would be helpful. I mean briefly there was opposing counsel said that there was no indication in the statute of geographic scope, but what the California Supreme Court said was that you could look at the statute and see in the text an indication that every pay relationship should be governed by the law of a state so that every employee is guaranteed the protection of the laws of a state. These were people who don't perform a majority of their work anywhere. They're effectively stateless people because they move around their flight attendants and pilots and all of them did more work in California than anywhere else. If we accept the implication canon which the state puts forward, settlements that did not affect sales in California would not be affected, right? So I think that the state would say every settlement affects sales in every state in every case because every pharmaceutical product they would say is marketed nationwide and go back to my answer to your earlier question, they are not targeting any particular price charged in California or even any particular effect in California that's unique to California. They are regulating the national market by regulating the settlement. That's the practical effect. It's not a practical effect is the legal import of the penalty provision of the prohibition and the penalty provision that you can see right on the face of the statute. So we are not making a practical effects argument. A practical effects argument would be if they regulated prices in California and the argument were that has the practical effect of changing behavior outside California. They are literally regulating a settlement entered into in New Jersey between a Delaware company and a New York company to to settle federal patent litigation pending in federal court. That is not a practical effects case. That is about what what the literal target of the statute is. Were you gonna talk about preemption? I would like to talk about preemption, your honor. I appreciate the chance to to do that. I think there are two key points that I'd like to make. One is about the point that Judge Bea made about flipping the presumption that California makes settlements illegal that federal law preserves as legal and it does so by adopting a presumption that the Supreme Court specifically rejected. And the second point is about exclusive licenses in which there is a statutory provision that that says that the patent owners may grant exclusive licenses in California is effectively saying no you may not. We will make your excellent exclusive license provision presumptively unlawful and treat it as suspect under our statute. I'd like to address both of those things and as a preamble. I was gonna say just as you address those it is not clear to me what theory of preemption you are relying on because I'm having a little bit of a problem tracking whether you're talking about a direct preemption with a particular statutory provision. You know I'm not sure where the theory emanates of conflict with the balance that was in Activa but you know and whether that precludes state antitrust laws to be enforced. So if you as you're getting into it could you clarify what theory of preemption you're really trying to rely on? It's conflict preemption it's not field or express preemption. Okay. And the relevant statute is the Patent Act and that's significant for a couple of reasons. One the state says that there should be a presumption against preemption because this is antitrust law and states generally get to have their own antitrust law. But none of those cases involve a conflict between state antitrust law and federal patent law which is by design exclusively federal. Patent cases are litigated exclusively in federal court. Patents are granted exclusively by the federal government and the Supreme Court and Benito Boats has said that the degree of patent protection is something that states are not free to either add to or subtract. Right but but AB 824 does not address the validity of a patent or the patentability of a product. So what it does so the Supreme Court in Activists reconciled the antitrust laws and the patent laws by saying that there that there is no conflict between them when under the under the in under the Sherman Act or the FTC Act a large and unexplained payment or large and unjustified payment that effectively substitutes for evidence that the patent itself is is of questionable merit or that it might not survive. California has taken that away here. In other words California has removed both what both the procedural step and the substantive evidence that the Supreme Court relied on in reconciling the antitrust the federal antitrust law with the Federal Patent Act. The Supreme Court said that it would not presume that a reverse payment agreement was unlawful. California does presume that it is unlawful. But where where does the Supreme Court indicate that it was intending or that Congress intended to displace state antitrust enforcement? Because as I read Activists it's not saying that reverse settlements are never subject to antitrust scrutiny. In fact it raised reasons why it would be even if the patent were itself valid and he gives several examples. But I don't read anywhere in there that's saying that this can only occur you know visa via conversation between federal patent law and federal antitrust law. I think that that's the necessary import of the federal questions that the that the Supreme Court decided at a minimum it didn't it didn't bless the idea that states could write their own different antitrust standards. What it did say was that in the context we here discuss. That's what it said at the beginning of part 3 page 159 and that context clearly is patent law because agreements to divide up the market or refrain from entering a market under ordinary circumstances under federal law are per se unlawful. The reason that the federal law I started that the Supreme Court applying federal law in Activists decided to apply the rule of reason not quick look review not per not the per se rule is that patent law is implicated. Now what did it use as a substitute for the scope of the patent test? It rejected the scope of the patent test but it said the reason that it was comfortable doing that is that the presence of a large and unexplained payment is an indication that the patent owner sees the merits of its patent as weak and subject to challenge. California has taken that away because this statute eliminates. So can I ask you just let's say AB 824 was never passed. Are you saying that California regulators if there was a settlement that was reached in California could not bring or could not try to enforce the Cartwright Act against a reverse settlement that occurred in California because of Activists? We're not saying that. But I mean but so then how do you square that because if you're saying that Activists implicated only federal patent law and displaced state antitrust laws I guess what your argument is is that the state cannot apply a presumption as opposed to the state would have to apply a rule of reason analysis under the Cartwright Act is that is that what you're saying? That would be part of it and the other part would be that it would have to turn on the same large and unexplained payments that the Supreme Court based its reasoning on. Now this so we're in other words you don't have you don't have to in order to rule for us in this case you don't have to rule that there is no state antitrust enforcement. Not at all. We're not saying that the Supreme Court said that there could be no state antitrust argument. That would be a field preemption type argument and as I've said we're making a conflict preemption argument but the conflict is that California has changed both the rules and the substance so it's partly the rejection of the rule of reason. It is also partly that it makes agreements unlawful that would plainly be lawful under federal court because of the absence of a large and unexplained payment. But for a conflict preemption you have to find an impossibility between two different laws. Respectfully no your honor. There are two lines of conflict preemption. The second line refers to the frustrating the purposes and objectives of the federal statute. That is the line that was at issue in Bonito boats. That is the line that we are relying on. But where where in the federal statute does it indicate that Congress intended to want reverse settlement agreements? Not just not just agreements that arise from ANDA filings but these particular types of agreements. Where where is there any indication that Congress wanted these things to take place? Respectfully your honor, I don't think that's what we have to show in order to show a frustration of the purpose for the same reason that there are that regularly when states make things illegal that are already illegal under federal law. I'm thinking of Arizona versus United States for example. The there can be a conflict precisely because it adds a different decision-maker applying different standards to to the mix. That's the problem here that California doesn't like the fact that there are some some settlement agreements that don't include what federal law would consider would consider to be a large and unexplained payment in exchange for delay. That's why they've adopted this unprecedentedly broad concept of payment and this unprecedentedly large concept of delay. And that is the reason that there's a conflict with with what federal law requires. I see that a question about the delay period. Does that delay period extend only extend typically to the length of the patent validity? No your honor. What California's law provides, let me let me give a general answer and then an answer about what this statute provides. These settlements regularly allow generics to enter the market before the patent expires. That's why they're a settlement. They are a compromise. But that's a direct result of the Hatch-Waxman Act, right? Which allowed them to file these claims with the FDA that they they were not infringing a valid patent. That's right and as long as there is even one patent still in what the FDA calls the orange book, a generic cannot launch unless it actually wins a litigation or that's that's exactly right. And so what AB 824 prohibits is any delay from the moment of the settlement until the moment of the generic entry even if that entry occurs years and years before the patents would otherwise expire. So in other words it deems an exchange of value including even just an exclusive license in exchange for in connection with any period of delay even literally you know you may enter next Thursday to be unlawful or presumptively unlawful under the statute. That is the conflict preemption problem. So does the delay in these agreements, does it cut short the length of time that the brand holds the generic patent, holds the patent that the generic has to challenge in order to go on the market? Does a settlement like that would be covered by this statute? The delay, is it like settling the amount of time of exclusivity of the patent? Effectively if the brand won the case it would be able to hold the generic off the market for the entire lifetime of the patent. By settling the agree by settling the case the brand agrees that the generic may enter not today but also not at the end of the period sometime in between and California has characterized that as delay but that is the point that is why the Generic Trade Association my client is here explaining to the court that these settlements are important for resolving these litigations because they may well result in generics getting into the market where otherwise patents would them off the market. We'll give you a little time for your rebuttal. Thank you very much your honor. Thank you your honor. I'd like to make two quick two points about the Dormant Commerce Clause and then if I have time one quick point about preemption. On the Dormant Commerce Clause I'd like to focus on our alternative path through similar to Flint where the court could uphold under the pre-national port decisions and in particular I believe that AAM is misreading what that pre- national port standard looks like. This court explained in Ward that the test is whether there is a sufficiently strong connection between the state and the regulated activity in order to justify the state's regulatory interest. The way that my friend on the other side has framed it suggests that you have to kind of dissect the the law to figure out what are the elements that are the transaction that's being regulated and separate those from the other elements. That's not how Ward or any of the cases looked at that question. The lens is through the state's regulatory interest. So here what's being regulated is not just out-of-state agreements. It's out-of-state agreements that have a connection to sales in California and that in-state sales is an element of the claim. If you had an agreement that was conducted out-of-state and did not affect California consumers and California sales the law would not reach that agreement and that's what ensures that the legislature's purpose of protecting California consumers is accomplished but limited to that purpose. The second point I would like to make about the Dorman Commerce Clause is... Can I ask but you know our en banc decision in San Francisco quoting Healy said the Commerce Clause precludes the application of a state statute to commerce that takes place wholly out of outside the state's borders whether or not the commerce has effects within the state. That would seem to undercut your Ward argument would it not? No but your honor that's a quote of Healy which the Supreme Court in National Pork explained doesn't mean what San Francis thought Healy meant. The Healy-Baldwin cases now after National Pork only stand for the proposition that price control and price affirmation statutes violate the Dorman Commerce Clause because those are discriminatory. The Supreme Court explained that those decisions were not about extraterritoriality at all. So those parts of the San Francis and Daniel Sharpsmart's decisions are no longer good law. The second point that I'd like to make is that regardless of the path a ruling for AAM would have far-reaching consequences beyond this case and AAM hasn't contended with any of those consequences. Their argument doesn't end at AB 824. In our brief we listed a number of examples of laws all of which regulate out-of-state conduct because of in-state effects. Whether that's other state antitrust laws like the Cartwright Act and laws from other states, tort laws, consumer protection laws, privacy laws, tax laws, all of those laws have long been understood to be constitutional even though they regulate purely out-of-state conduct because of the in-state effects. So a ruling for AAM on this on this question would not just invalidate AB 824, it would call into question all of these traditional long-standing laws and impede the ability of states to exercise their traditional police powers. I see I have no time left so I'm not going to make the preemption point. I would just point out that the point I was going to make is really well articulated by the California Supreme Court in the opinion in Cipro which directly addresses the preemption question before this court so I would just commend that opinion to your honors. Thank you. Thank you counsel and then we'll leave two minutes on the clock for rebuttal. I appreciate that your honor. Just briefly on the point that my friend just made, the California Supreme Court in Cipro did not consider the issue that is before the court today precisely because the legislature came along after Cipro and decided that the law in California was insufficiently stringent. It disapproved of activists and it disapproved of Cipro and it decided to make laws presumptive, sorry, make settlement agreements presumptively unlawful that both activists and Cipro treat as presumptively lawful and so that's why it's just simply not correct to say that this is the same question before the California Supreme Court in Cipro. The preemption arguments that we've mustered are those based on the statute itself and the ways in which it changes both the substance and the procedure from what federal law had dictated. I don't want to tax the court's patience and I know that I'm up here for cross-appeal rebuttal but unless the court has any further questions. No other questions. Thank you counsel and thank you both for the helpful arguments. The matter will stand submitted.
judges: WARDLAW, BEA, SANCHEZ